Good morning, everybody. Welcome to the 11th Circuit Wednesday session. Judge Brasher and I are here with you in flesh and blood. Judge Branch is on the telephone, and I'm going to do, I promise, a better job today of calling on her when necessary to ask questions. So she will be playing the voice of God today. So if you hear a voice, it's Judge Branch. She should feel free, of course, to interrupt the proceedings as Judge Brasher and I will to ask questions along the way. But just given the reality of the situation, I'm going to try to remember at the end of your presentation to ask Judge Branch if she has questions before you sit down. You guys have probably done this before, so you know the drill. We've read the materials. We understand your case. So please don't waste your own time with factual and procedural ramp-up. Just get straight to the core of the issue that you think drives the decision in your favor. You understand the traffic light system, the timing system. I'm not one to cut you off mid-sentence, but we would ask you that as the red light approaches and then lights up to wrap it up, as we've got four cases this morning. All right? So with that, let's call the first case, United States of America v. Jimenez-Shilon. Please tell me if I haven't pronounced that correctly. This is number 20-13139. We have Mr. Beshear here for the appellant and Mr. Seekanen here for the appellee. Mr. Beshear, you have 12 minutes, it looks like, three minutes in rebuttal. Very well. Fire away. Thank you, and may it please the Court. Good morning, Your Honors, and Judge Branch, and counsel. There are two reasons why Section 922G5A's categorical ban on firearm possession unconstitutionally infringes on Mr. Jimenez's fundamental individual right to bear and keep arms. First, the Second Amendment's text unequivocally protects the right to keep and bear arms for the people, a unitary phrase that is distinct from the phrase or term citizen and one that the Supreme Court has consistently interpreted as including persons like Mr. Jimenez that have substantial ties to the country. And second, the relevant history and tradition of the Second Amendment establishes the government has the power to restrict dangerous persons from firearm possession, but here, as either a logical or empirical matter, the government has not shown that illegal aliens and unlawful aliens as a class present a danger to public safety to justify a categorical ban on all firearm possession by all aliens in all places for all purposes. So can I ask you a question? Is it, even if we were to grant or to assume or to conclude that your client is part of the people for purposes of the First, Second, Fourth, Ninth, Tenth Amendments, is it necessarily true that your is that the Second Amendment as originally understood embodies? So if we rewind the clock to England or to the colonies or to the framing era, I'll just confess, like my own research suggests that the right was won accorded to people who were part of the polity, subjects, citizens, and that's not necessarily to say that only those people constitute or only those persons constitute the people, but perhaps that only those individuals partake of the right to keep and bear. Yes, Judge Newsom, and I think you hit the nail on the head of really what the tricky part of this people question is and where it lies into what Heller talked about the fundamental right to bear arms. So just to unpack your question and take it back in a historical basis, I think the first thing that we should look at is the framing of how we determine the Second Amendment right and the government's power to restrict those individuals. And as you pointed out, if we go back to England or even to the beginning of the colonies and the foundation of this country, who were those persons that were historically dispossessed? Now, I would confess the history is not entirely clear about if we look at it in terms of positive rights as to who exactly was conferred to those rights, but under the Second Amendment, if we look at who is dispossessed, what we can pretty definitively tell is that dispossession was not on the basis of alienage. The closest analogs that we could find, and crude as they may be, do tend to depend on the treatment of slaves and Native Americans. Both of those tend to stem from the idea that arming slaves would be a risk to public safety. There would be rebellion from the slave class. The same thing with Native Americans and the country. And if we're going to be honest about this conversation, there was at the time of the founding issues with Native Americans and rebellion. The same, you can also extend to other things that our friends have brought up on the other side about those that profess disloyalty to the nation. So those are the analogs. But if we look at those historically, all of those tie to dangerousness. And if we now look to present day and present day immigration and being illegal and unlawful in this country, not a, in many instances, a civil offense, broad to cover, even those like Mr. Jimenez, who was brought to this country as a child, could include our dreamer class, etc. That drawing a line between a distinction on alienage, which is really the critical aspect here, 922 G5A ban is on that status. So I guess just so I don't get too far afield, so I take the what I'll call the Barrett-Harteman position, the dangerousness position that you're referring to here. I guess I had sort of understood that to be sort of like a tertiary criterion. The first being, are you or are you not part of the people? Let's say yes. The next of the national community, not necessarily in the people sense, but in the right to keep and bear sense. And from that, the reason I say that is that if you look at, for instance, the English Declaration of Rights, it says subjects, the Bill of Rights proposals from the states often tied the right to keep and bear to citizens. And then the Federalist Papers refer to citizens taking up arms. And then only then, if the answer to that question is yes, now you ask, as Barrett and Harteman do in the felon and possession cases, are you dangerous? And so I wonder, I think we're actually at step two in my question, not at step three, if that makes sense. Yeah. And I think, Judge Newsom, step two, historically, I think, falls squarely on our side. And I'll take each one of the points that you take out. So if we look at the history of British subjects versus the United States, there's a clear difference between the way, you know, dating back to the Statue of Northampton and the way subjects were treated as opposed to the language choices that the founders used. All the language choices that you refer to in the Federalist Papers of the people versus citizen and the privileges that are afforded to citizens never made it into the Second Amendment, as you pointed out, in the that second step, it does tend to become circular and reductive if we interpret the people to mean the same thing as citizen. And the language choice of the people itself is a, I believe, Webster himself was a Federalist who proposed the language of the people, people being just the singular of persons, persons being distinct from subjects and different than the And if we're looking at that national politic, all we need to do is look at the language of Heller and we can look at Verdugo or Keyes and Justice Rehnquist's language. So even the precedent tends to be in our favor. So if we're at that step two, and if I would contend that that step two question really is, it does devolve back into a step one of, are you part of this national Yeah, so I think I get it, that steps one and two, like the inquiry is similar. But at step one, where you're asking, you know, this phrase, the people is repeated in the Constitution, right? I think anyway, one, two, four, nine, 10. And so there you're in the Verdugo case there, you're, you know, actually think you've got a sort of a decent argument on Verdugo. Verdugo seems to me to suggest that there are two classes of persons who might be people, those who are like intrinsically part of the natural polity, and then those who are not that, but who have developed connections such that they should be treated as that. So if you are part of the people, but now you've got to look at, okay, you're part of the people, you're within the language of the Second Amendment. Now let's figure out what was the right that the Second Amendment codified? What was the pre-existing right that the Second Amendment codified? And if that right, whatever it was, was limited to subjects, citizens, whatever, then even if you are part of the people, it may turn out that you don't partake of that right. Does that make sense? Yes, it does make sense. But I would still say that that right, being it that it conferred to only certain citizen subjects, it's still a, and Heller, I think, is pretty strong for us on this point, that it's a right tied to the fundamental right of self-defense. And it's a right tied to the days of Aristotle and a very natural law concept of self-defense. So the two parts of it, the individuals like Mr. Jimenez, and I want to make clear by any standard, I think Mr. Jimenez would qualify as having substantial connections to the country, that inherent right of self-defense, that inherent right to protect oneself with firearms is a right that was not explicitly based on just being deemed a citizen or just being a particular person. It was a, I like to look at it in the sense of a negative freedom, not a right that was conferred by the king or a right conferred by the state itself, but it was an inherent right of an individual to protect oneself. And the Supreme Court is now, even in New York pistols, is expanding upon that as well to carry outside the home. So who enjoys that right in that second basis? It really does tie to the fact that the language choice that we have, and that right is an individual right that is based on that, tied to the right of self-defense, much more than it is for this national politics. The national politics question, as I understand it, is a lot more to Verdugo analogy of those individuals that are part of the national community. And it makes sense here in this country, in this context. If we look at the class of illegal and unlawful aliens like Mr. Jimenez, individuals that have lived in this country their entire teenage and adult lives, they're no more or less entitled to protect one themselves and their home, their property, their families. Statistics and studies even would show that they probably have more of a reason to protect oneself. I'll just say, I think we've got that one. But could you address the government's argument that there is a sort of a propensity to violence? I mean, that's not the right phrase, but the government's interest in limiting this right as it applies to illegal immigrants, unlawfully present persons, whatever you want to call them. Yes, and I see I have just a minute left. We're going to carry you beyond. It's totally fine. I just want to make sure, because there's a lot, there are separate parts. So there's three parts, and I want to address each one in kind. The first one for 922 G5A, the express purpose in the Gun Control Act of 68 and 86 is this idea that illegal aliens as a class have a propensity for violence. That as a matter of empirical data is either not proven or disproven by the studies that we've shown. And as a matter of logic, we can see, and I can see Your Honor may not be 100% convinced by that. So I want to- Well, here's the part of the government's argument that seems somewhat compelling to me, which is that these people sort of by the nature of being included in the class are subject to deportation. They're subject to being, I don't know if arrested is the right word, but grabbed by federal authorities. And it may not, the problem may not be that with a felon context, for example, where we're worried about them using violence against other people. It's more of a sense of when the feds show up to initiate deportation proceedings that there is sort of a heightened potential for violence. There's like inherent conflict, confrontation risk there. What do you say about that? Right. And if there's nothing else that I leave the court with today, I want to stress that whether we're looking at this in a means end or text history tradition, just the supposition of that being true cannot in and of itself stand. The empirical data I think is critical. But if we also look at it from just a logical standpoint, being here in this country illegally at its core is a civil offense. The idea that illegal aliens would engage in violence being rounded up by ICE would first have to stem from this idea of certain laws that we've had passed in this country, like the 1080, for example, in Arizona, where you could pull over individuals and stop them at an idea that they were here in the country illegally. None of those examples have ever led to a showing that illegal aliens engage in violence towards law enforcement. And it's very distinct from an idea that some, because there's no doubt that there's a public safety interest. And I think if it was true that there was, if we just look in a Fourth Amendment context, for example, when law enforcement is actively in pursuit of a criminal or someone who's escaped from justice, there's always an exigency reason. There's always a public safety reason to make sure that person doesn't have weapons on them. Those are all types of use restrictions. That same and would happily accept amnesty or a dreamer, or like Mr. Jimenez, who was working here and living for about 20 years. The notion that he would then engage in violence towards law enforcement just does not bear out in any empirical matter. And as a matter of logic, doesn't follow for someone who actually wants to stay into the country and that there's this active conflict between, as Judge Brasher, that you put it, that there's an inherent conflict. That inherent conflict that we see in the criminal context, or someone's committed burglary, someone's fleeing and eluding law enforcement. Those type of situations, the direct analog to our, the way that we treat immigration in this country as a civil matter, the way that we've seen it play out over, now over 50 years. If we were to say that, to say that this is this, this sort of concern about violence or use of firearms is not enough. Would that have any effect on sort of sentencing enhancements for firearms, you know, laws that ban the possession of firearms and drugs at the same time, things like that, where I think the government's argument would be similar that, you know, there's nothing sort of inherently wrong or there's nothing inherently violent about having a firearm, you know, in the same car as your drugs. What do you say about that? Yeah. And I cannot believe I'm going to, I've got a compliment. Okay. And I can't believe I'm about to compliment the Sentencing Commission, but I am going to make a nod to the Sentencing Commission because I think Judge Brasher, you make a good point with trying to draw those at 1326 offenses, for example, and the way that the Sentencing Commission has now revised those guidelines to eliminate certain enhancements and increase enhancements on the basis of illegal re-entry into the country. And the Sentencing Commission does do a decent job, I would say, in most respects, of being able to tie instances of drugs and guns possession and whether or not those have an inherent risk of violence, 924C offenses, for example, or there are 2K enhancements. So you'd be saying that the empirics are different for those, that's what you'd be saying? I think, and the easiest thing for this court to do in an instance, because of the way our record is here, the court could just remand because we don't have those findings and just would ask for the government to be put to its burden. But I'm quite confident the government will not be able to show that burden because in other contexts, we see that it's just not true. I really think the pressure point and the difficulty of this case is we're just dealing with two aspects in our politics that are just highly charged, whether it's the right of Second Amendment and dealing with illegal or unlawful alien class. So there's this tendency to think that being here in the country illegal or unlawfully is in and of itself a violent offense or a criminal offense. That's not true. And then we have 50 years of data as well as logic to indicate that this is a class of individuals, whether or not we agree they should be here, whether or not we agree that they should have taken a different path to be here. It's just a fact of matter that those that have been here that have substantial connections aren't any more danger to the community than ordinary citizens, and that have not presented any reason for law enforcement to think they would be anymore. So if we're talking about intermediary scrutiny or strict scrutiny, if we're dealing with the fundamental right of narrow tailoring, the over-inclusive, all-encompassing ban, not a manner and means restriction, not a use restriction, that targeting of illegal aliens, or we're looking at a historical basis of where we have the justification being on the fear of rebellion or the fear of revolt or harm, we have quite the opposite situation here. We have a class of individuals that, if they were, and I believe this is true, do organize politically, their main political position is a granting of citizenship. They want to stay in this country. And as the court, and I fully acknowledge the difficulty of this task, but the court, even in the Second Amendment context, is not, this is not a Hoyer deference or Chevron deference where we defer to the judgments of the executive. There is a requirement, because we're dealing with the Second Amendment, for the government to come forward with proof. And I would never shy away from the idea that the United States has an interest when we're talking about the border, for example, the United States has an interest on who comes into the country's safety. But when we're dealing with categorical bans on more than the presupposition, and it would take much more than that. And I think this court really should take that step forward, because other courts, and again, if I was to leave the court anywhere, they give short thrift to this logical basis of, well, there's a basis that illegal aliens might evade law enforcement, and then that justifies the right. If that much was true, then any individual that has a basis to avoid law enforcement, of which I'm quite confident everyone in this courtroom has some family member that does not want to engage with law enforcement, or if it was enough to commit a civil offense and disrespect the laws of this country to disarm individuals, that's a slippery slope, that's just a bridge too far when we're dealing. Can I ask you one more question, and then I suspect that Judge Branch may have questions before you sit down. So you, as best I can tell, concede in your brief that our Georgia Cary decision is binding for the proposition that we have to do means end scrutiny. I'm wondering why, like why you concede that, because as I read the cases, both Georgia Cary and the cases that come after it, we've never actually gotten through to the second step. We've sort of said like, well, if we got there, this is probably how we would do it, but we've never done it. And being an officer of the court, I'll just confess, I'm hedging on the idea as well, because I agree. I don't think the court, I think in terms of Georgia Cary being binding case law, yes, that's what I concede. As far as it being the test, absolutely not, because Heller itself rejected interest, a balancing test. In fact, that was Justice Breyer's entire dissent that was rejected. The court in New York has still, for whatever extent we can read tea leaves from the court, I don't think there was a justice on the court that accepted anything other than a text history tradition. I'm quite confident, even if this court just waits until June, text history tradition will be the mode of analysis. So I do think the Georgia Cary and the text history tradition in a certain respect are different roads to a similar path. What we, and why we have made the argument in the alternative to just make clear that the proper analytical framework and the one that this court should accept is where Georgia Cary has been applied in other contexts. Here, when we're looking at the core fundamental right, the court has not passed on G5A. The text history tradition is the mode of analysis compatible with Heller, McDonald, and in a predictive exercise of which predicting Supreme Court opinions is always dicey, but I'll put, not my reputation on it, but I'll put. Let's not get carried away. Yeah. Let's, but at least saying that, I think Judge Newsom, you're absolutely right that the court has not expressly held that Georgia Cary needs, is the mode of analysis that needs to be followed. But I do confess that that is the accepted precedent of this court. So just to be clear. All right, good. So let me ask Judge Branch if she has questions. Uh, yes. Thank you, Judge Newsom. Um, so Mr. Beshear, I wanted to have you comment on two of the historical citations that the government has made. You said in the reply brief that founding era legislatures did not exclude non-citizens of the right to bear arms because of their citizenship status. But the government has cited to a 1776 Pennsylvania law that conditioned the right to bear arms on pledging an oath to the allegiance to the Commonwealth of Pennsylvania. And the government has also cited two historical materials that indicate that during the American Revolution, colonial government disarmed people who refused to swear an oath of allegiance to the state or the United States. How isn't this strong evidence that the right to keep and bear arms did not extend prior to the founding to those who did not owe political allegiance to the state? Well, Judge Branch, and I'm sorry that I'm staring up because the voice is coming from there. I told Judge Branch yesterday that everyone responds to her by looking up. I'll just look at the blank over here. Uh, Judge Branch, in that distinction, and I think it's, and I don't want to get into a semantic debate, but I do think there's a distinction between disarming those based on alienage and citizenship rights and the express basis of those that did not swear an allegiance to the country being the logic being those that did not swear an allegiance were in potential rebellion and could cause harm to the public safety. And that's where the historical basis that in Pennsylvania and in other states, being a citizen was the prerequisite as opposed to what we would find under the people. And that's where in Judge Newsom's earlier discussion in the step one and step two, being amongst the people, having those substantial connections in a certain respect, I wouldn't say substitutes, but demonstrates that respect for the United States in the sense that they would not be seen as the same type of individuals that during a time of a real revolution refused to swear an allegiance being, if you're not with us, you're against us, that logic. So the government's historical basis on alienage, not only, I would strongly contend that that is not definitive proof that the line was alienage. I think more than enough commentators have made the point that the lack of trust towards the United States, it's these group of individuals that were distrustworthy. And it's the same now if we look at other G categories of those that have renounced their allegiance to the United States. That would be the more historical analysis. I guess, though, in fairness, in addition to the citations that Judge Branch has raised about allegiance, this may suggest that allegiance and citizenship sort of went hand in hand in the colonial slash framing era mind, because there are also historical sources, for instance, the Massachusetts and New Hampshire proposals for the Second Amendment that referred specifically to citizens, state constitutions at the time, a number of them anyway, limited the right to keep and bear to citizens. And so, you know, it may be that there was sort of this allegiance thing and citizenship status going kind of hand in hand at the time. I think that my first retort to that would, of course, be the very fact that there was language that conferred to citizens and the founders chose to citizenship and the people are not synonymous. But the second part to that as well as where they kind of this idea that the people and the citizenship go hand in hand, really, I think, goes back to your step two question that it's one of the main reasons for choosing the rights of the people is all the times the Constitution refers to the rights of the people. These are, again, these negative freedoms where the government then has to show the power to restrict as opposed to conferring or granting the right of those that can possess firearms. So, to equate the right of the people to be the right, I'll use the language, the privileges of the citizens, that is the conscious decision the founders eliminated and where the history shows where the right to bear arms is not the same as the king or the colonial times, the state granting the affirmative privilege to bear firearms. And that is very important because, I mean, just as a logical matter, pre-United States, citizenship could not have been the task for determining, at least in the American history, who has the right or who qualifies for the right of the Second Amendment because we didn't have citizenship in that basis. And the modern day 922G5A's line of drawing between on the basis of immigration is just an apples to oranges comparison because we didn't have that same immigration basis. So, G5A's line is expressly on immigration status. So, even if we're looking at it from a historical basis, this question of who is the people and what this court should do in this instance, even if we're going to go down the road of determining whether or not Mr. Jimenez qualifies as among the people, the better approach here would be to remand for that evidentiary hearing so we could at least put on our evidence and the evidence that we try to put forward to demonstrate this allegiance, showing that we can meet your step two, I'll say your step two basis because G5A's line is on the immigration status where historically, even what we're talking about now is on the basis of allegiance and showing a propensity to rebel against the union. Okay, good. So, Judge Branch, do you have any other questions? I do not. Okay, Mr. Beshear, thank you for your patience and your endurance. Thank you. We'll see you in a few minutes. Thank you. Mr. Siekinen, am I pronouncing that correctly? Yes, your honor. Thank you. Sorry. Good morning, your honors. May it please the court, Sean Siekinen for the United States. My opposing counsel in the court have touched on several important issues and questions that I would like to respond to, but I'd like to begin by putting this in context. I think that's important. Whether or not the Second Amendment covers illegal aliens, which it does not, and whatever standard of scrutiny applies, if it does, or even under the sort of strict text and history analysis that Mr. Jimenez Shiloh proposes, the Constitution does not prevent Congress from barring illegal aliens from possessing firearms in this country as part of Congress's broad and unquestioned authority over immigration matters. So, will you explain to us why that is? Is that because illegal aliens are not part of the people, as that phrase is used in 1, 2, 4, 9, 10, or is it because they don't partake of the right to keep and bear? This is step one and step two, right? Do they fail at step one or step two? Both steps, and I'd also suggest that there's a third step that is consistent with Heller and with this court's recent cases applying Heller, and that third step is, I think the simplest and most straightforward way to resolve this case is that this court should simply hold that subsection G5 is the same sort of presumptively lawful, long-standing restriction that Heller acknowledged and that this court has consistently found to be unconstitutional under White, Rozier, and Foscher. And why is that? There are several reasons. Maybe let's do it if you don't mind. Let's do it in order. Let's do step one first, then we'll get to step two, then we'll get to your step three. So, step one, why are illegal aliens – no, not why are illegal aliens, but why is this particular illegal alien not part of the people, as the Supreme Court has interpreted that phrase in Verdugo? Well, I would say that neither Verdugo nor Heller purport to set forth the sort of ad hoc case-by-case test for assessing whether any particular illegal alien qualifies for certain constitutional protections. I would say that what Verdugo purports to – what Verdugo says is it simply distinguishes between various broad classes of groups that may or may not qualify for protection under… So, does that mean that an illegal alien can't bring, in effect, an as-applied challenge to this provision, saying, like, look, I mean, somebody in this case, I think, brought up the woman, the valedictorian at Yale or whatever, who, like, outed herself as an illegal from the podium. Does she not qualify under Verdugo as someone who, while not intrinsically part of the national community, has developed sufficient connection with this country to be considered part of that community? I would say no. I would say the best reading of Verdugo, given the context of the issue presented in Verdugo and the cases cited by Verdugo – let's go back. I'd like to go back to the language. I'll quote from Verdugo. Verdugo says that the people protected by the Second Amendment, number one, are a narrower class than persons protected by other amendments. And moreover, to the extent that Verdugo holds that the people must have ties to the national community, that doesn't necessarily mean that those ties are all that matters. To the extent that Verdugo suggested that the scope of the narrowed the scope of the Second Amendment to those people who historically enjoyed the right to keep and bear arms, which Heller made clear was law-abiding, sane, otherwise qualified people. Okay. So that's fine. But I think now we're at step two. So, I mean, step one, which is who are the people, which Verdugo and Heller both say it's in the first, second, fourth, ninth, tenth. So it's going to be used consistently across provisions. And Verdugo, as I read it, says that it's a disjunctive. The class of persons who, one, are part of the national community. I think you might be right that illegal aliens are not intrinsically part of the national community. But also, or two, who have otherwise developed sufficient connection with this country to be considered part of that community. So I can see how illegals would be out at 1A, but I'm not really sure that they are as a class out at 1B, including the Yale valedictorian. Well, the only authority that Verdugo cited for that point was a 1904 case. Well, Verdugo is the United States Supreme Court. I mean, it could have cited nothing for that proposition, and we would have to pay homage to it. But wasn't Verdugo about extraterritoriality? I mean, it wasn't about, I mean, so it seems, I mean, to me, at least, it just seems completely indistinguishable because we're talking about the extraterritorial effect of the Fourth Amendment. We're not talking about people in the country. I think that's right, Your Honor. And I also want to respond to Judge Newsom's point. I wasn't suggesting that this court does not need to pay homage to the language in Verdugo. I think that other courts have looked at it as dicta, but nonetheless, to the extent that it clearly does have precedential weight, the reason that I is not to undermine the significance of the court's point, but to put it in context. The case that the Supreme Court cited in making that distinction about being members of the national community was a 1904 case holding that an excludable alien was not entitled to First Amendment rights because he does not become one of the people to whom these things are secured by our Constitution by an attempt to enter forbidden to the law. And that also is the court's language in the majority controlling opinion in Verdugo. And I think the significance of that is that if you take everything in context, if you look at the issue that was presented in Verdugo, what the court was trying to decide and resolve there, and look at its statement about national community or people who could potentially become part of that national community in the context of the authority that Verdugo cited, what it suggests to me is that insofar as constitutional rights are can develop those connections simply by virtue of his legal status, immigrant versus non-immigrant, legal versus illegal immigrant, not that it turns on these sui generis factors such as how long a particular alien has been in the country or all of these various factors that would have to be weighed and frankly lead to I think what would be a very difficult standard to apply. It would be odd if, the other thing to keep in mind is that we're at the first step of the inquiry here where we're talking about the coverage or the scope. And it would be unusual, it would be odd if the coverage or scope of a constitutional right changed, vested, accrued in this sort of transient manner based on such a complex array of sui generis factors. So that's what I'm suggesting and that's why I think that Verdugo is susceptible to a reading that is more practical that would lead to a more manageable test. And what that test should be is simply that the way that an alien, an immigrant can demonstrate the sufficient connections is by going through the legal process and by immigrating legally if they choose to enter this country. Let me ask you to address the specifics of the alien. Assume that we do have to look at the specifics of the alien's connection with the country. You know, it seems to me that you might still win if we did that. Because from what I can tell, this particular alien's connection with the country, really the length of his time here is the only sort of factor that there is. I mean, this isn't someone, for example, who had lawful status at one point and then lost it. It's not someone who's applying for asylum. It's not someone who is a dreamer. What do you say about that? I would agree with those points, but I don't want to put too much weight on that because we've conceded in our brief that if this court gets to the point of applying that test and weighing those factors, that then remand would be appropriate for the evidentiary hearing that Mr. Jimenez-Shylon requested and I think the court correctly concluded was not necessary for all these other reasons. I agree with your points, but we've conceded in our brief that remand would be appropriate if the court found it necessary to weigh those factors. Okay. All right. So let me ask you about step two then. So let's assume that the illegal immigrant in this case is or has become part of the national community such that he is one of the people. Now step two, what's the scope of the right to keep and bear vis-a-vis, call it non-citizens, non-allegiance, non-national polity members, whatever? What's the historical scope of the right? Sure. The historical right to keep and bear arms that the Second Amendment codified was traditionally limited to law-abiding virtuous citizens or members of the polity. And to give some specific examples of this, potential subversives and those disloyal to the sovereign were historically excluded, so too historically were Native Americans who were not then recognized as citizens. Heller acknowledged this at least generally when it talked about this core protection of the Second Amendment. And the Fourth Circuit addressed this at length in Carpio Leon. In that case, they cited and discussed eight different books and academic articles discussing these various colonial and pre-revolutionary firearm restrictions in this country and also in England along all of these lines and along some of the lines that Judge Branch mentioned a few moments ago. So let me ask you this though, because so you mentioned virtuous citizenship and the Fourth buys into this virtuous citizenship idea. But what about, again, what I'll just call the Barrett slash Hardeman position that the criterion isn't really virtuous citizenship but instead dangerousness? And to Mr. Bashir's point, there's no sort of empirical reason to think that illegal aliens are uniquely dangerous. Well, I think dangerousness only comes in when you get to the intermediate or if this court were to take the drastic step of applying strict scrutiny, which no other court has. So maybe that's right. But I guess I thought I read the Barrett and Hardeman opinions to say that dangerousness is sort of like the criterion by which one decides whether this, in those cases felons, are inside or outside of the right. I don't think they were really balanced anywhere. They were just like, are you inside or outside of the right? If you're maybe, then some other court might do some means and scrutiny. I don't think they were inclined to do it. I'm hesitant to disagree with you about your characterization of those cases, Your Honor. I don't specifically recall that point of emphasis, but I can't say that you're wrong. I do recall that what Judge Barrett said was that whether or not you look at these sort of things on the front or the back end, it usually leads to the same result, and it has in every case in which every court in this country has looked at it. No court has held that this particular restriction is unconstitutional as applied or facially, either because it does not apply to illegal aliens, or because if it does, it's justified under intermediate scrutiny. And it strikes me, just to preview for Mr. Bashir on his rebuttal, another response, which I think I sort of floated to him anyway, is that it could be in the felon cases, those people, they're not excluded at step two, because the felons are citizens. So they might initially partake of the right to keep and bear, but they might be excluded, so say Barrett and Hardiman, either because they are dangerous. But I guess it may be that in my sort of taxonomy is at step three. At step two, it may be that illegals fall out because they're not citizens, the sort of modern-day subjects, and you never really get to a dangerousness inquiry. Well, I think it might be important at this point to take a step back, and I'd like to point out that Verdugo and also the has, I think, made fairly clear that citizens are definitely more narrow in scope than people, but people is also more narrow in scope than persons. And I think this is an important point, because to the extent that the only context in which any with the Supreme Court or any appellate court has recognized constitutional rights for illegal aliens has been as persons under the 5th or the 14th Amendment. So what my opposing counsel is asking for here really would be quite extraordinary, because going back to Verdugo, the court in Verdugo was very explicit that the Supreme Court has never even gone so far as to recognize that illegal aliens have even 4th Amendment rights. And I think Heller makes clear, to your Honor's point, that the scope of the 4th Amendment, when we know that, that was historically true before Heller, and Heller makes it even more clear, because clearly convicted felons and the mentally ill have 4th Amendment rights. And Heller makes crystal clear that, at a minimum, those two classes fall under, are the sort of groups that may lawfully be prohibited from possessing weapons under these sort of long-standing prohibitions that Heller did not call into doubt. So I just, I wanted to clarify that I think there are clear differences between citizens, people, and persons with one being a subset of the other, and I think that's important to keep in mind, because if this court gets to the, gets so far as to addressing whether or not illegal aliens qualify as people under the 2nd Amendment, which it need not do, I don't think, that would be the Is there, is there, is there some, well, I'll just confess, a practical concern of mine to deciding this case on a, the people basis, is that, do we really want to hold, what will us, I mean, I think we should assume that the people means the same thing in 1, 2, 4, 9, and 10. Do we really want to hold that illegal aliens can be sort of prior restrained, no speech rights at all, that in the course of an arrest could be beaten to a bloody pulp and they have no excessive force claim? It's sort of easier sort of atmospherically to say they have no 2nd Amendment rights than to say that they have no 1st or even no 4th Amendment rights. That, that, I just worry about the breadth of that holding if we were to go down that road. I agree. I think there, there are two reasons why this court need not go that far. The, the, the first, which is getting back to my initial point, is that the way that this court handled the question when it came up in White and Rozier and Fosio was primarily focused on whether the challenged prohibition under subsection G of 922 was the sort of presumptively lawful long-standing prohibition that Heller acknowledged without going so far as to get into whether or not, what the meaning of the term people. So that's one reason why I think this court need not go that far. The other distinction I think to be drawn here is that I will concede that the people as a term of art in isolation, I think must mean the same thing where, where it appears throughout the Bill of Rights, but it appears in different contexts in each amendment. And at a minimum, whatever it means in the 4th Amendment and the 1st Amendment, Heller makes clear that it identifies at least two classes of people who are people, as we commonly understand that term, and as Verdugo defines it, being convicted felons and mentally ill who, who presumptively do not qualify or not covered by the 2nd Amendment. So I think this court can hold that the people means the people, but I think Heller makes clear that then the scope of the 2nd Amendment is somewhat narrower than, than what the scope might be in other contexts based strictly on that. Can I ask you a question about that? I think the analogy between this case and to the two groups that you just mentioned, felons and the intellectually handicapped is sort of interesting. There's no violence rationale, right? For, for prohibiting people who are mentally handicapped from possessing firearms. Well, I'm hesitant to say there's no violence rationale because I think at the end of the day, that's the overarching reason for every firearm restriction. Well, I guess, I guess maybe that's, and maybe I'm suggesting that's not right, right? So, you know, we historically have prevented felons from voting. Historically, we prevented mentally handicapped folks from voting. We prevented folks who are under the age of 18 from voting, used to be under the age of 21 from voting. We prohibit certainly illegal aliens from voting, except I think in New York. Is potentially these longstanding prohibitions on certain groups from exercising the right to bear arms, does it potentially have something to do with their relationship to the political community and their ability to sort of be full citizens in the community and more so that than some kind of violence rationale? I think it could in certain cases, and I think that the criteria that you would look at in making those determinations may overlap. But I do think that Heller makes clear that there are two separate inquiries. What is the scope of the Second Amendment generally? And that's what the court talks about in the first part of its opinion, where it discusses Verdugo, what does the people mean? And then later in the that whatever the Second Amendment means, and whoever is covered by it, that that does not that not cast any doubt on the validity of these, what the court referred to as these longstanding, presumptively lawful prohibitions. So I think there are two separate things. And I don't know if it makes sense to, I have been looking at that as sort of the third step or the third inquiry, maybe it's, you know, 2A and 2B. But whatever order in which this court takes the question, I think these are all these are all hurdles that Mr. Jimenez-Shiloh would have to clear in order to establish that this prohibition is unconstitutional as applied to him, you have to demonstrate, number one, that this prohibition is not the sort of longstanding, presumptively lawful prohibition that this court has upheld in its other recent cases. And then that's, you know, then you would have to also establish that he falls within the scope of the Second Amendment generally as an illegal alien. And then if he gets that far, then this court would have to apply intermediate scrutiny and do that sort of balancing test. I also another on domestic abusers possessing firearms. And White's rationale was simply that that is the same sort of longstanding, presumptively lawful prohibition that Heller had recognized. But that prohibition was enacted in 1996. So it's, I don't see how. Yeah, but I guess I mean, I mean, I think my reading of White, I mean, that's a very short analysis, I think, in that case, but my reading of it was that that was sort of akin to felon disenfranchisement. It was sort of the same kind of category. And what I guess I'm trying to figure out here on this particular argument is what makes this prohibition on unlawfully present persons possessing firearms sort of akin to something that, you know, whether it's mentally disabled or children or whatever, what makes this similar to that? I'll concede that it's qualitatively different, as are most of the prohibitions in 922g. But I think the answer to your question has to come back to the historical, the traditional basis and understanding and was this the sort of I are illegal aliens, the sort of class that historically was entitled to keep and bear arms as part of the right that the Second Amendment codified. And I think for the reasons that in our brief and that I set out earlier, the answer to that is no, because Heller and the other courts that have looked at this have acknowledged that that right was traditionally limited to law abiding virtuous citizens. And there were often exclusions and prohibitions directed at potential subversives, those disloyal to the sovereign, those unwilling to take a loyalty oath. And I also want to ask you a quick question before you move off of that. One question I have just about the implications of your position, which is a matter of history. I'm not sure I disagree with about this notion that the contours of the right at, you know, in 1791 were understood to apply to subject slash citizens slash allegiant people. But where does that leave lawful aliens, legal aliens? Well, did they have no Second Amendment rights either under your view? Forget about the people. Let's assume we're at step two and now we're deciding the scope of the Second Amendment right. If on your sort of historical analysis, again, with which I'm not sure I disagree, Massachusetts and New Hampshire say it ought to be citizens. The state constitution say it ought to be citizens. The Federalist Papers refer to citizens. Where does that leave legal aliens? Well, I guess under the test that I'm First of all, I'm certainly not arguing that legal aliens do not have constitutional protections. I'm not necessarily arguing that they don't either. But to bring it back to Verdugo, I read Verdugo to suggest that the test for being a member of the national community or someone who's demonstrated sufficient ties should turn on their legal immigration status, not these particulars. And under that test, I suppose courts could go different ways. But I could certainly see, I mean, I think it would be much more reasonable for this court or for any court to hold that a legal immigrant, someone who's immigrated in accordance with the laws set forth by Congress, that's what they need to do to demonstrate the sort of sufficient connections that Verdugo was talking about. But Verdugo, though, that's about the people, right? Who's the people? And Verdugo says, here's the test for the people. I'm saying, let's assume that legal aliens are the people, that they can adopt those I's and cross those T's and make themselves part of the people. Now the question is, what's the scope of the Second Amendment right to keep them there? And your position, again, with which I'm not sure I disagree, is that at common law, sort of at the time of the founding, that was really limited to with respect to the Second Amendment specifically. I'm sorry, I'm going to have to punt on this, Your Honor. Is it possible, let me just, I mean, is it possible that there are just so many different classifications of legal aliens that that answer may vary whether like the, if you've got a green card, maybe you're more like a citizen. If you're here on a tourist visa for two weeks, you're sort of less like a citizen. I mean, is it possible? And that's why I apologize for punting on the issue. I will say that I agree that, so certainly this court would not need to address that question in ruling on this case. I have not thought about all the particular different ways in which a legal immigrant may or may not qualify under the Second Amendment. I do think Heller makes clear that although a legal immigrant could be a number of the people, they may not be entitled to certain Second Amendment rights or not the full because, again, the Second Amendment does not necessarily protect felons or the mentally ill who are unquestionably part of the people. So, I don't know exactly how or where that line would be drawn with respect to the different questions that Judge Brasher's suggestion that there are gradations of legal aliens makes all the sense and all the practical sense in the world to me. But if the Supreme Court has said you've got to look at this sort of as an original matter, what is the scope of the right as understood in 1791? There it seems to me the line that you're drawing, and again I'll just say again with which I'm not sure I disagree, so I'm asking this question as much of myself as I am of you, is basically a citizenship line. Citizens had the right. Others didn't. And where does that bright line leave modern-day legals of whatever gradation? I don't know. I think that there would be many gradients and different types of legal immigrants and there would be different lines that would have to be drawn. I think that's the best I can say at this point. The other thing I can say is I would be happy to file a 28-J letter on this. No, no, no. I think it's okay. We're just sort of testing the limits of the proposition. Let me ask you, Judge Branch, do you have questions for the government? Yes, I do. Thank you, Judge. And I'm not suggesting that we have to proceed to a level of scrutiny in this case, but if we were to proceed, I want to turn your attention specifically to Judge Manashi's concurrence in the Perez case and his concerns about the level whether the majority had in fact applied a robust intermediate scrutiny. What evidence do you provide to support your assertion that illegal aliens present substantial risk to public safety? And doesn't intermediate scrutiny analysis require us to independently assess the government's evidence that its chosen means are substantially related to its proper interest? Well, part of the reason that more evidence is not in the record is because there was not an evidentiary hearing because the district court correctly concluded that it didn't need to get that far. So I think it wouldn't be unreasonable for this court to remand if it concludes that it needs to apply a level of scrutiny and if the court finds that there's not enough evidence in the record to satisfy the government's burden in that respect. But I do think that there is evidence in the appellate record establishing the substantial link between the means and the ends of the statute. And it's the same sort of evidence, the same sort of historical evidence as a general matter that other courts in this court have often relied upon being academic articles, books, citations, and other judicial opinions. So your point is well taken, Your Honor. I don't think that this court needs to get that far. And if it does get that far, I do think that this court could affirm under intermediate scrutiny for the reasons in our brief, but if this court has concerns about that level of particularity in terms of that sort of data, then in that case, then I do think that remand would be appropriate. But I hope that this court doesn't need to get that far. And I'm not suggesting that you do. I'm just, I share some of the concerns of Judge Manasci, particularly outside of McDonald, that the Second Amendment keeping bear arms is not a second class right subject to an entirely different body of rules. And I think Judge Manasci's concern that the majority, even though it purported to be intermediate scrutiny, was applying a very soft intermediate scrutiny. Well, I understand your concerns. I see that my time is up. I do have a few more thoughts on that. This was so long ago, it doesn't even matter. I'll take that as an invitation to further respond, Your Honor. So a few general points that I wanted to make regarding intermediate scrutiny. The issue is not that aliens or illegal aliens are necessarily have a propensity for violence as my opposing counsel suggested. I will take it as a given for the sake of argument that illegal aliens as a class may have the same propensity for violence as U.S. citizens or others in this country. But nevertheless, there are at least three specific important purposes or goals that to which 922 G5 is substantially related. The first I would say is the risk of foreign power sending hostile agents over or across our borders for nefarious purposes, including threats against the president or the vice president, as Congress specifically noted when it enacted this prohibition in 1968. That was one of the specific risks or concerns in the bill. My second point would be reducing risk of violent crimes committed by non-citizens who specifically have already demonstrated a disrespect for the law and the willingness and ability to evade U.S. authorities by virtue of the fact that they have entered the country illegally and remain in the country illegally. And then to pick up on the Second Circuit's decision in Perez, the last point that I want to make is that without legal documentation and status, an alien who chooses to arm himself will probably evade the normal background checks and licensing requirements associated with firearm purchases and therefore be more likely to or even forced to resort to obtaining guns either in the black market or to minimum the secondary market to circumvent those requirements. So it's not just, you know, an abstract propensity for violence. There are these very real, particular concerns about aliens who choose to enter this country illegally and remain here illegally than using firearms while they're in this country. And for those reasons, I think 922g5 easily satisfies intermediate scrutiny, whatever the other data might show about sort of crime rates and those sort of data points. Okay, very well. Judge Branch, are you satisfied? I am. Okay, thank you very much for your patience and endurance. Thank you. Mr. Beshear, I will pledge on behalf of myself only not to turn this into another marathon. While you're getting set up, let me ask you. So Judge Branch mentioned the Menashe concurrence in the Second Circuit. And one of the things he says is one of the things that I talked to the government about, which is that he says that the Second Amendment protects more of a political right than a civil right. And sort of the through line on these sort of presumptively, you know, reasonable regulations of the Second Amendment, felons, incompetence, Indians, things of that group. What do you say about that logic as to say, well, illegal aliens are sort of also outside the political group, even though they, of course, have civil rights, right to, you know, enter into contracts and things of that nature? What do you say about that? Yes, Judge Brasher. And don't worry, I have plenty of money in the meter. So I'm on your side. The current concurrence is to confess fully because I, in reading it, was quite happy to find the same concerns that Judge Branch is bringing up. But it really, I think, touches on the same thing that Judge Newsom is talking about at this step two about what is the right of the Second Amendment. It seems to be kind of the heart of the argument here today. Heller does make clear that the Second Amendment right is a fundamental individual right. And really, the question here now we're asking, and Judge Brasher, I think you touched on this too, with the government's argument is, well, the Second Amendment uses language to people and refers to the right to keep and bear arms. So if we stipulate that aliens can qualify among the people, and now we're talking about what is the right of the Second Amendment, to get around treating aliens any differently or what the scope of the right is requires either reading more into Heller than what the court actually held or getting around the language in and of itself. And the concurrence there is really taking this virtuous citizen concept and grafting it onto the right of the Second Amendment, saying the Second Amendment confers a right that was essentially a virtuous citizen right, basically to say that aliens as a class fall outside of the political class entirely such that they could never qualify as the people. And I think Judge Newsom, you're referring to this in the earlier discussion. And one of the points I want to stress here as well is the court here does not have to hold aliens as a class qualify as the people. The real question is who, what the language of the Second Amendment refers to as the people, the text of the Constitution is supreme, as we pointed out the first, fourth, ninth, and tenth. If the court is to hold that the people excludes aliens, that logical consequence there is quite dangerous because we would get into a world that we're now we're talking about the Fourth Amendment has different rights. And if we just take even from a historical basis, the historical justifications for the Fourth Amendment, the risk of assistance rummaging through homes, I'm quite confident historically that those concerns may not have been exclusive to citizens. But that right in and of itself is not the line drawn, though historically may have been more justified on the basis of citizen subjects protected from the king, is not exclusive. To just citizens, the way that the Constitution is written. And I think the same logic applies in terms of the Second Amendment, where we have historical basis, and commentators and scholars, and quite admittedly, and I can see my three minutes is up. But if I may continue, history shows and really the analytical framework here when we're talking about the step two and step three in today's discussion. Once we've established who is amongst the people, the real question then comes is the government's ability historically to disarm and dispossess those people. So if we're going to look at it from a perspective of historically, can the government is that right conferred on to citizens, I would say to that, once we've answered the people question, Heller has not told us that the right is exclusive. Heller did not pass on that question. Parsing through Heller to extrapolate, or I think as was suggested, suggest Verdugo didn't say what it said about who could qualify amongst the people is not something that this court should do. If anything, I completely agree with my colleague that we should remand this case to establish who's amongst the people. But that next step that Barrett-Hardiman analysis is, well, what is the government's litany of them here? Dangerousness, which I think my friend has also conceded that aliens as a class are not inherently more dangerous. Judge Brasher, to the examples you were bringing up about whether the mentally ill, 922G9, how does that interplay with 922G5? In those situations, we have one of two things going on. Either you have logical correlations or empirical correlations. There is a logical line between handing a firearm to somebody who's mentally unwell, or there's empirical data to show habitual drug use, for example, people's ability, their frontal cortex, they have an ability to conform themselves to modern day norms. They could be a danger to possessing firearms. Going to the other Heller presumptively lawful list, I would strongly encourage the court not to go down that route. I think that has been, even the Supreme Court itself has acknowledged that the presumptively lawful list is not anything more than passing language in Heller, and there's not much we can read into it. But the logic still goes in this line of dangerousness. It's not that felons are not people and the mentally ill are not people. Aliens are not people. The question is, as a class, are the, is that the type of person that we need to disarm? And the real historical basis, other than dangerousness, comes to those that affirmatively refuse to swear an allegiance. I think that's what Judge Branch is referring to in looking back at the government's brief, that the, from the colonies and the states, those that either were feared to rebel against the union or refuse to swear an allegiance, that's a positive affirmative act, conduct, those could be, those persons could be dispossessed. So past conduct, showing of violence, showing a disallegiance to the country, it's quite different than the status of just being in the country illegally or unlawfully. And that's the really important part here. And all the courts, and I think I share the same concerns with Judge Branch, though I'm not sure. She's up there somewhere. We have the same conclusion, but I do think Judge Branch, you hit on a very important point as an empirical basis and the concerns that the concurrence showed, that the Second Amendment quite often, because we're dealing with firearms, when we're dealing with speech and the, or speech, I think is a good example, and the propensity to violence, there's a bit of a disconnect and you can see a difference. There's a lot more leniency in terms of the right of the people to assemble. Nobody here would say illegal aliens do not have the right to peacefully assemble in front of the White House or in front of Congress and ask for amnesty. Nobody would say that. That right exists. But when we're talking about firearm possession, it's a different, we treat it differently because of the inherent belief that firearms are dangerous. But the whole purpose of the Second Amendment is this idea that the Second Amendment protects the individual right to bear arms for one's own protection. So reasoning by analogy, I think is extremely helpful in this case, because if we just look at the Second Amendment and treat this as the same type of right, when we're talking about the right of the people to be secure in their persons, and the example of beating illegal aliens to a pulp when they're caught by the police, nobody would say that. In fact, it's the very reason our government goes to the lengths of taking individuals overseas, extraterritorial application, otherwise. There's a pure recognition that once somebody is on U.S. soil, if they have substantial connection to this country, we treat them the same for the purposes of the Constitution. So as difficult as it may be, as a point of emphasis, the Second Amendment, the people, as all people and not as second-class people, it's very important to look at that same analogy. And textually and historically, the First, the Fourth, the Ninth Amendments, we want to treat them all the same here. So this court either should hold that this categorical ban on the basis of immigration status does not further the ends of dangerousness that the Supreme Court should remand, consistent with what either this court should hold as a text history tradition or what the Supreme Court will hold as well. And I'm happy to answer any other questions or feed the meter. Very well. I think we have it. Judge Branch, are you satisfied? Yes. Very good. Thank you both very much. Interesting, and you both did very well. Thank you. Thank you.